IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 27, 2019

**STATE OF TENNESSEE v. NORMAN LEE FOLLIS**

**Appeal from the Circuit Court for Anderson County**
**No. B2C00092A     Donald Ray Elledge, Judge**

_____

**No. E2018-01667-CCA-R3-CD**

_____

Defendant, Norman Lee Follis, appeals his convictions of first degree murder and theft of property, for which he was sentenced to life imprisonment without the possibility of parole. On appeal, Defendant challenges the trial court's denial of a motion to suppress his statement and the sufficiency of the evidence to support the first degree murder conviction. Because the trial court did not abuse its discretion in denying the motion to suppress and the evidence was sufficient to support the first degree murder conviction, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Tracey Vought Williams (on appeal), Petros, Tennessee; Wesley Stone and Susan Jones (at trial and sentencing), Knoxville, Tennessee; and Mart Cizek (at trial and motion for new trial), Clinton, Tennessee; and, for the appellant, Norman Lee Follis, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Dave Clark, District Attorney General; and Anthony Craighead and Emily Abbott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Anderson County Grand Jury indicted Defendant and Tammy Sue Chapman in February of 2014 for the first degree murder of his uncle, Sammie J. Adams, the victim, and theft of property belonging to the victim valued at more than $1000. The

grand jury also indicted Defendant for one count of forgery. Prior to trial, the State filed a notice of intent to seek the death penalty.

Defendant was the victim's nephew and lived in an apartment with his girlfriend, Ms. Chapman, on Pat Lane in the same building as the seventy-nine-year-old victim. Defendant's father Norman Follis, Sr., and stepmother, Sandra Follis, lived down the street from Defendant and the victim in a house. The victim was last seen sometime in early December of 2011. In early to mid-January of 2012, someone called the police to report the victim missing. The police performed a welfare check at the victim's apartment on January 22, 2012. The police did not find the victim during the initial search of the apartment. Several days later, the victim's body was discovered in a closet at the apartment. The victim had been dead for some time. According to the medical examiner, the victim had suffered blunt trauma to the neck, which was caused by either impact blows to the neck or by strangulation. Despite the lack of ligature marks, the medical examiner determined that the manner of death was strangulation.

*Motion to Suppress*

During the police investigation surrounding the victim's disappearance and death, Defendant gave several statements to police. Prior to trial, Defendant filed a motion to suppress his statements, arguing that he was "improperly subjected to custodial interrogation" and made involuntary statements to authorities. Defendant filed a second motion to suppress his second statement on the basis that it was the "fruit of [an] illegal arrest and illegal seizure." The trial court denied both motions after two separate hearings.

At the first hearing, Detective Shawn D. Flinn with the Anderson County Sheriff's Office testified that the office received a call reporting the victim missing on January 22, 2012. The caller requested a welfare check of the victim, so Detective Flinn went to the victim's apartment. Once he arrived at the apartment, he entered the residence and searched all the rooms. The victim was not located inside the apartment at that time.

When Detective Flinn arrived at the victim's apartment, he saw Defendant and Ms. Chapman standing outside across the street. Detective Flinn spoke to Defendant and Ms. Chapman after the search because officers were aware that they had "prior contact with [the victim]" and had received information that both Defendant and Ms. Chapman "had been seen driving [the victim's] car." Detective Flinn read Defendant his *Miranda* rights prior to initiating the conversation with Defendant and explained to Defendant that he was not in custody at that time. Defendant agreed to talk to him. Detective Flinn testified that the conversation lasted "less than five minutes." The conversation was recorded. As a result of the conversation, Defendant was not taken into custody or

arrested. Detective Flinn explained that Defendant was not a suspect at that time. At this point in the investigation, police did not know the victim's whereabouts or condition.

During this conversation, Defendant claimed that he had taken the victim to "St. Mary's North" hospital in December because the victim was feeling sick. Once at St. Mary's North hospital, the victim refused to pay his insurance deductible. Defendant then took the victim to "St. Mary's downtown" where the victim got "irate." Defendant left the victim at the hospital. Defendant claimed that at some point after that, the victim was transferred to "Lakeshore" for a twenty-one day evaluation. Defendant told officers that he called Lakeshore on probably the 15th or 16th of December and was told that the victim needed to be in an assisted living facility when he was released from the hospital. On the date of the welfare check, Defendant claimed that he did not know the victim's whereabouts. Defendant had a "feeling" that the victim could possibly be in the "VA" hospital in Murfreesboro, Tennessee. Defendant explained that the victim's car was at his "shop" in Knoxville.

Several days after the welfare check, Detective Donald Scuglia spoke to Ms. Chapman, who was being held in custody on an aggravated burglary charge. As a result of his conversation with Ms. Chapman, Detective Scuglia determined that he needed to talk to Defendant again. At that time, the police had still not located the victim.

On January 24, 2012, Defendant voluntarily came to the Sheriff's office to give "assistance in Ms. Chapman's arrest." Because he did not have transportation, Defendant was brought to the station in a police cruiser. "[P]er [Sheriff's office] policy, Defendant was handcuffed" during the transport. Once Defendant arrived at the Sherriff's office, the handcuffs were removed, and Defendant was read his *Miranda* rights. Defendant signed a waiver of rights form. At this time, Detective Scuglia explained that Defendant was not free to leave as part of "an investigatory detention due to the statements made by Ms. Chapman and the fact that we had a person who we do not know his whereabouts." Detective Scuglia explained that Defendant was aware he was not free to leave and, in fact, made no attempts to leave.

Detective Scuglia again recorded this interview with an audiotape. He described Defendant as "very nervous and agitated at the beginning of the interview." After about one hour and nineteen minutes of conversation, Defendant asked if he needed a lawyer. Detective Scuglia explained to Defendant "that wasn't [the detective's] decision to make." The detective testified at the hearing that Defendant never requested a lawyer and that "[t]his portion of the interview concluded with [Defendant] implicating himself in the disappearance of [the victim]." Defendant requested and was granted a smoke break. When the interview continued, Defendant was again reminded of his rights but continued to speak with Detective Scuglia. Defendant implicated himself in the disappearance and death of the victim. From that interview, a written statement was

generated in which Defendant admitted that he killed the victim and shoved him in a closet at the apartment. Detective Scuglia acknowledged that the written statement did not contain Defendant's signature but testified that it was "in his handwriting." After Defendant gave the written statement, he consented to a DNA test and was arrested. The victim's body was located later that evening in the closet of the apartment underneath a pile of blankets.

At the conclusion of the first hearing on the motion to suppress, the trial court found that both Detective Flinn and Detective Scuglia were credible witnesses. Moreover, the trial court determined that Defendant was properly advised of his rights on January 22 and January 24. The trial court commented that it was "the first time [the trial court] had ever seen an officer go to the extent that [Detective] Scuglia did in terms of reading and having the defendant to read and recording his advisement of rights to [Defendant]." The trial court deemed the advice of rights "appropriate" whether Defendant "volunteered to come in on his own" or not. The trial court noted that after the break in the interview that took place at the Sheriff's office, Defendant was again reminded of his rights before he continued to talk to the police. The trial court explained that the "only possible issue is the question that was asked [by Defendant]: do I need an attorney?" The trial court determined that this was not a request for an attorney and that the officer responded appropriately. As a result, the trial court denied the motion to suppress.

At the second hearing on the motion to suppress, Defendant argued that the statements made by Defendant on January 24 were the result of an illegal detention. At this hearing, Officer Jefferson Davis of the Anderson County Sherriff's office testified that he responded to an aggravated burglary call at the home of Defendant's father and stepmother on Pat Lane. Officer Davis arrived in his unmarked car and spoke with Defendant. Officer Davis advised Defendant that Ms. Chapman had been arrested for aggravated burglary and asked Defendant if he would "be willing to help" or "give a statement." Officer Davis told Defendant that he was not under arrest at that time but that he would be transported to the police station for the investigation. Officer Davis explained that Defendant did not have a car. Defendant was handcuffed per department policy and transported in a marked patrol car by Sergeant David Davis. The handcuffs were removed as soon as Defendant arrived at the police station. Officers informed Defendant that he was not under arrest at that time.

The trial court determined that both of the officers were credible and that Defendant was told specifically that he was not under arrest. Defendant agreed to go to the Sherriff's Department. The trial court found it was "a voluntary transportation" and that Defendant was handcuffed per department policy during transport. The trial court found there were "no questions asked of him about anything involving . . . [the victim]"

- 4 -

and that Defendant was properly Mirandized. The trial court denied the motion to suppress.

## Trial

Defendant's case was severed from his co-defendant girlfriend. At trial, Mrs. Sandra Follis testified that she married Defendant's father, Norman Follis, Sr.,[1] also known as Cracker, in May of 1993. At that time, the victim was living in a camper in their backyard. Mr. Follis's first wife was the sister of the victim and the mother of Defendant. Mrs. Follis had a good relationship with the victim. She and her husband sold the victim the car he owned at the time of his death. At some point, around May of 2011, Mrs. Follis explained that she and Mr. Follis "got into it" and that Mr. Follis moved out to live in one of the apartments down the street. Mrs. Follis actually changed the locks on the house. She gave a key to her home to the victim. During this time, the victim lived in the house with Mrs. Follis for a "maybe a month and then [Mr. Follis] moved back in like October because [there was] no heat in the apartment." About a month after Mr. Follis moved back into the house, the victim moved in to the apartment where he was later found dead.

She recalled that in December of 2011, Defendant told her that he took the victim to the hospital. Mrs. Follis never saw the victim again after her conversation with Defendant. Mrs. Follis even tried to call hospitals and nursing homes in the area in order to locate the victim. Mrs. Follis became increasingly concerned when the victim did not show up to eat Christmas dinner with her family. Mrs. Follis recalled that the victim drove a large light blue car and that she had never seen anyone else driving the car. This is the same car that Mrs. Follis sold to the victim. Mrs. Follis explained that the victim did not have a job but always carried cash.

Mr. Jim Franklin lived at 137 Pat Lane near the victim and Mrs. Follis. Mr. Franklin had known the victim since 1991 or 1992 and described him as "very active" and "pretty strong" for his age. At some point, the victim lived with Mr. Franklin for several months because the victim was "getting robbed," and Mr. Franklin thought he could "keep people from robbing [the victim]." Mr. Franklin recalled that he saw the victim nearly every day for the three to four years preceding the victim's death. Mr. Franklin always saw the victim with his wallet. The victim often took out his wallet to show how much money he had in it. Mr. Franklin last saw the victim on December 9 or 10, 2011, when they discussed the sale and purchase of the victim's lawn mower. Mr. Franklin talked to Mr. Eddie Weaver, Mr. Follis, and Mrs. Follis about the victim's whereabouts. Someone told Mr. Franklin that the victim "was in the hospital so [he]

---

[1] To distinguish him from Defendant, we will refer to Defendant's father as Mr. Follis. Mr. Follis died in 2013.

- 5 -

started calling the hospitals and trying to find him." Mr. Franklin was unsuccessful in finding the victim at a local hospital.

Between mid-December and the time the victim was found, Mr. Franklin saw Defendant and Ms. Chapman go in and out of the victim's apartment at least ten or twelve times. One of those times, Mr. Franklin saw Defendant exit carrying a large "manila envelope" full of "a bunch of stuff" that "looked like papers." Mr. Franklin also saw Defendant driving the victim's car "several times" after the victim was missing. Mr. Franklin explained that this was "not typical" because the victim would occasionally allow Defendant to drive the car during the day but always required Defendant to return the car by nightfall. The victim always parked his car in the driveway in front of Mr. Franklin's house. After the victim disappeared, Mr. Franklin saw the victim's car, a "'99 or 2000" Mercury Marquis, parked at a residence down the street for about a two-week period of time. There came a point in time that the car was no longer parked on the street, but Mr. Franklin could not remember an exact date on which this occurred. Mr. Franklin reported the victim missing in December by "put[ting] an anonymous thing into Anderson County" on the internet because he "felt like something was going on, you know, foul play."

Mr. Ronald E. Weaver, Mrs. Follis' son from a previous marriage, did not live on Pat Lane; he lived "about three miles up the valley." He called Defendant, his stepbrother, "Joe" or "JoJo." Mr. Weaver described the victim as a "hard worker" and "just a real good guy." He saw the victim "every time [he] went" to Mrs. Follis's house, or a "couple of times a month." The victim always carried cash in his wallet and "[u]sually had a couple of hundreds" in his wallet. In December of 2011, "[r]ight after Christmas" he noticed that the victim was not around. He mentioned the victim's absence to Mr. Franklin and his mother. After hearing a "rumor" about the victim's whereabouts, he and "Mr. Franklin got together" and "thought [they] needed to come down to Anderson County and report it." Mr. Weaver recalled that he and Mr. Franklin reported the victim missing "around January 15th or so." He was present when the police performed the welfare check at the apartment on January 22, 2012. Around this same time, Mr. Weaver asked Mr. Franklin to keep an eye on his mother's house because Mrs. Follis "felt like somebody was coming in and out but she couldn't prove that."

Deputy Shawn Bannach went to the victim's apartment for the welfare check and gained access from the landlord. Once inside, Deputy Bannach noticed the apartment had a "real dirty smell, mildewy smell." Deputy Bannach "believe[d] the upstairs shower had been running" because "[t]here was moisture leaking from the ceiling upstairs." He and another officer looked room to room to see if they could locate the victim. Deputy Bannach noticed a pair of "coke bottle [eye]glasses" on a table. They looked like "the type of [eye]glasses that you'd have to wear at all times if you wanted to see." There was a closet underneath a stairwell that was blocked by a couch. Deputy Bannach moved the

couch out of the way and opened the door. Inside the closet, he saw a large pile of clothing and blankets. Deputy Bannach did not touch the blankets. The officers who searched the home did not locate the victim but contacted detectives based on the condition of the home.

Detective Flinn became involved in the case after "a flyer [was] put out through a tip line" when the victim was reported missing. He came to the victim's house during the welfare check. In his assessment, the interior of the home was messy, and there was a "lot of stuff" lying on the floor. "[T]here was a real odor of heavy mildew" that appeared to be coming from "water running inside the apartment" from a location somewhere upstairs. Detective Flinn was present when the closet door was opened but did not see anyone inside the closet. As he exited the victim's home, he saw Defendant across the street. Detective Flinn approached Defendant and spoke to him after reading him his *Miranda* rights. Defendant signed a waiver and spoke with the officer. During this conversation, Defendant insisted that the victim was somewhere in a hospital. Detective Flinn was unable to verify any of the information provided by Defendant during the conversation.

The Tuesday after the welfare check, Mr. Franklin saw Ms. Chapman walk up the street to Mrs. Follis's house, stick a key into the door, and go inside the house. Defendant and Ms. Chapman were not allowed into her home. The only people with keys to her home were the victim and her son, Ronald E. Weaver II. Mr. Franklin had been asked to watch Mrs. Follis's home, so he called Mr. Weaver to report Ms. Chapman's behavior. Mr. Weaver called the police. As the authorities arrived, Ms. Chapman went out the back door of the residence. Former Sheriff's Deputy Jeremy Baker[2] met Ms. Chapman at the side of the house, and she was arrested.

Detective Scuglia became involved in the case on January 24, 2012. At this point, officers had not located the victim's body, and neither Defendant nor Ms. Chapman was a suspect in the victim's disappearance or death. Defendant voluntarily came to the police station to talk about Ms. Chapman's arrest. Defendant was not under arrest but was transported in handcuffs in a patrol car per Sherriff's Department policy. Defendant signed a *Miranda* waiver.

Once Defendant and the detective started to talk, Detective Scuglia informed Defendant that he was no longer "free to go." Defendant and the detective talked about all the places Defendant had lived in the years preceding the victim's disappearance. Defendant explained that he and Ms. Chapman lived in the apartment on Pat Lane and

---

[2] Mr. Baker had little recollection of the events that occurred on the day Ms. Chapman was arrested. He explained that he was "disabled" because he suffered from left lobe epilepsy due to multiple concussions from playing football. Mr. Baker further explained that the condition affected his memory.

that Mr. Follis had lived with them for a short time. Defendant claimed Ms. Chapman had "muscular dystrophy." Defendant explained that he knew the victim and that they had an "ok" relationship. Defendant stated that the victim was an older gentleman who got "irritated at times about stupid stuff" and that the victim had even threatened him one time by pulling a gun on him. According to Defendant, the victim was unstable. Defendant recalled a time that the victim accused him of taking some of his money.

Defendant explained that the victim was not missing but that he was in the hospital. Defendant claimed that he took the victim to the hospital where the victim refused to pay a deductible. Defendant told Detective Scuglia that he took the victim to another hospital and left him there. Defendant claimed he later learned the victim was at "Lakeshore" for an evaluation. Defendant claimed the victim gave him permission to drive the victim's car. When Detective Scuglia confronted Defendant with the fact that he could not verify any of Defendant's claims, the detective asked Defendant if the victim was still alive. Defendant answered, "Yeah. To the best of my knowledge, yeah." Defendant claimed that he did not know where the victim's body was located. At that point, Detective Scuglia confronted Defendant with a "little drawing" by Ms. Chapman, which depicted an altercation that took place between Defendant and the victim that resulted in the victim's death. Defendant eventually admitted that the victim "had [Ms. Chapman] down and she couldn't get up." Shortly thereafter, Defendant asked, "Do I need a lawyer right now, I mean do I need to talk to a lawyer?" Detective Scuglia replied that was "entirely" Defendant's decision. Defendant continued to talk, admitting that he saw the victim attacking Ms. Chapman through the window, so he went in and said this was "the end of it." Defendant tried to get the victim off of Ms. Chapman, and the victim turned around and grabbed Defendant. At that point, Defendant grabbed the extension cord off the heater and put it around the victim's throat, choking him. The victim ended up on the couch. Defendant "shoved" the victim in the closet. Defendant did not think the victim was alive when he shoved him in the closet. The detective took a break in the interview, during which Defendant took a smoke break.

When the interview resumed, Detective Scuglia reminded Defendant of the *Miranda* waiver that he had previously signed. Defendant again admitted that he killed the victim in the middle of December. He explained that he was walking in the front door of the victim's apartment when he saw the victim on top of his girlfriend. Defendant claimed that the victim had one hand on her crotch and one hand on her breast. Defendant hollered at the victim to stop. When the victim did not stop, Defendant grabbed the victim, and the victim grabbed him back. The two men ended upon on the floor with the victim on top of Defendant. Defendant explained that he grabbed an electrical cord and put it around the victim's neck. The victim let go, and Defendant was able to get free. The victim ended up on the couch; Defendant was not sure if the victim was breathing. Defendant eventually determined that the victim was not breathing, so he shoved the victim in the closet and picked up the victim's car keys. Defendant admitted

- 8 -

going back to the victim's apartment a couple of times after he killed the victim, including one time after police were there looking for the victim. Defendant explained to the detective that he sold the victim's car because half of the title had already been signed and because the victim did not have insurance on the vehicle. Defendant initially denied signing the car title but eventually admitted that he signed the victim's name.

At the conclusion of the interview, Defendant wrote a statement admitting that he killed the victim and sold the victim's car. The statement reads as follows:

> I Norman Follis approached the ap[artmen]t of [the victim], saw him holding Tammy Chapman down on the couch, groping her. [H]ollered as I entered the door, he looked at me, and didn't stop, I went over and try to pull him off of her when he turned and attacked me, he had me down on the floor and I couldn't get him off of me. I grabbed the first thing I could get hold of and it was a cord of the heater, I put it around his neck until he let go of me, then pushed him onto the couch[. A]t that point I didn't know what to do so I pushed him into the closet and left. When I left him he wasn't moving or anything. I took the car and used it for a while before selling it to an unknown person I had just met. I had used the car for a while before all of this happened.

After giving the statement, Defendant consented to a DNA test. Defendant was then arrested. Police secured a search warrant for the victim's apartment where the victim's body was discovered in the closet under a pile of ten blankets. A cord from a Sears electric blanket was located next to the victim's body. According to Detective Scuglia, the victim's back pocket "had been out-turned." The victim's wallet was not recovered.

Dr. Christopher Lochmuller, the Anderson County Medical Examiner, testified that the victim had "significant" underlying heart disease. Dr. Lochmuller also noticed the right side of the victim's neck was bruised and that there was broken larynx on the left side of the neck. The medical examiner testified that a broken larynx required "force." There were no obvious ligature marks, but the body was "fairly discolored and the tissues [were] getting a little bloated," which could have obscured any existing ligature marks. The injuries to the victim's neck were consistent with strangulation. Dr. Lochmuller explained that strangulation required significant pressure and would require three to five minutes of pressure to interrupt the blood flow to the brain, causing a stroke and brain injury prior to brain death and eventually death.

Charles Wayman testified that Defendant sold him a 1997 Ford Mercury on January 16, 2012, for $1000. He acknowledged that the victim's name, not Defendant's name, was on the title. Mr. Wayman knew Defendant as "Joe" and had "met him at Pull-A-Part" a couple of times "working on cars." Mr. Wayman had known Defendant for

"[m]aybe a couple of months." Defendant presented the title to Mr. Wayman and signed the back of the title with "Samuel J. Audrey or something like that." Mr. Wayman took the car and title to his grandson, Richard Barr. Mr. Barr signed the back of the title and took possession of the car. Several days after the transaction, Defendant called Mr. Wayman and asked to borrow the car. Mr. Wayman told Defendant he could not borrow the car because he had already given it to his grandson.

Defendant did not testify at the guilt phase of his trial. He did not present any proof.

After hearing the evidence, the jury found Defendant guilty of first degree murder and theft. The State dismissed the forgery charge. After hearing additional testimony, including Defendant's testimony, the jury rejected the death penalty and sentenced Defendant to life imprisonment without the possibility of parole. The trial court sentenced Defendant to four years for the theft conviction, to be served concurrently with the life sentence. Defendant filed a timely motion for new trial. The trial court denied the motion. This appeal followed.

*Analysis*

*I. Motion to Suppress*

On appeal, Defendant first argues that the trial court erred in denying the motion to suppress. Specifically, Defendant argues that there was no warrant for his arrest when he was "taken to the police station in the back of a police car and in handcuffs" under the pretense of helping his girlfriend and that he was coerced into talking with the officers. The State disagrees, insisting that the record supports the trial court's determination that Defendant voluntarily went to the Sheriff's Department and waived his rights by signing the *Miranda* waiver.

In reviewing a motion to suppress, this Court will uphold the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). Additionally, our review of the trial court's application of the law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

- 10 -

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

Here, Defendant argues that he was unlawfully seized when he was handcuffed and taken to the police station. The trial court heard the testimony of the officers, who specifically told Defendant he was not under arrest when they asked him to come to the police station to assist in the investigation of an aggravated burglary for which his girlfriend was implicated. The officers explained the department policy to handcuff anyone transported in a patrol vehicle and testified that the handcuffs were removed once Defendant arrived at the station. Defendant agreed to accompany the officers to the station. Once at the station, Defendant was advised of his rights, waived those rights by signing a *Miranda* waiver, and spoke to the police even though he was informed at that point that he was no longer free to leave. The trial court deemed the testimony of both officers credible. The evidence does not preponderate against the judgment of the trial court. Defendant is not entitled to relief on this issue.

Defendant also argues that his resulting confession was coerced. The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id*. (citing *Dickerson*, 530 U.S. at 433). However, Defendant did not raise this issue in the motion to suppress filed in the trial court. Therefore, Defendant has waived the issue by raising it for the first time on appeal. *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 36(a) ("Issues raised for the first time on appeal are considered waived.").

## II. Sufficiency of the Evidence

Defendant argues on appeal that the evidence was insufficient to support his conviction for first degree murder. Specifically, Defendant claims that the State failed to prove premeditation because there was no proof to support premeditation prior to the murder, no proof that a deadly weapon was used, and no declaration of his intent to kill the victim. The State disagrees, insisting that premeditation was established by Defendant's actions during and after the victim's death.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973)). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(a)(18). Premeditation is defined as "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). This section further defines premeditation as follows:

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

Viewing the evidence in the light most favorable to the State, the evidence presented at trial showed that Defendant entered the victim's apartment and got into an altercation with the victim because he was groping Defendant's girlfriend. During the struggle, Defendant "grabbed the first thing [he] could get hold of . . . a cord of the heater." Defendant put the cord "around [the victim's] neck until [the victim] let go." Defendant then pushed the victim onto the couch. When Defendant realized the victim was no longer breathing, Defendant shoved him into the closet and pushed a couch in front of the closet door.

Defendant claims that there was no proof he used a deadly weapon; however, "[o]bjects other than traditional weapons may, depending on their use, be deadly." *State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997). In this case, the cord was certainly used as a deadly weapon when it was procured by Defendant and placed around the victim's neck. Additionally, the proof supported a finding that Defendant had the requisite intent to kill the victim, despite Defendant's argument to the contrary. The medical examiner testified that it could take anywhere from three to five minutes of pressure on the victim's neck in order to strangle the victim to death, giving Defendant ample time to reflect on the nature of his actions. The victim's larynx was broken, and the medical examiner testified that a person had to use force to break a larynx and apply

more than gentle pressure in order to strangle someone. Moreover, Defendant concealed the victim's body by shoving it in the closet and moving the couch to obscure the entry to the closet before leaving the house with the victim's keys. All of these things—Defendant's statements and admissions about his actions both prior to and after the victim's death, his treatment of the victim's body after death, his use of the victim's car after the victim's death—supported a finding of premeditation. In our view, the evidence was sufficient to support the conviction of first degree murder. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE